1
2
3
4
5
6
7
8              **IN THE UNITED STATES DISTRICT COURT**

9             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    MARLENE B. SUMMERS,                    No. CIV S-08-1309-CMK

12              Plaintiff,

13         vs.                               <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                Defendant.
16
      _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21    judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22    before the court are plaintiff's motion for summary judgment (Doc. 20) and defendant's cross-

23    motion for summary judgment (Doc. 23).

24    / / /

25    / / /

26    / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on September 20, 2005.[1]  In the application, plaintiff claims that disability began on February 26, 2005.  In her motion for summary judgment, plaintiff claims that disability is caused by a combination of: "osteoarthritis in the shoulder, lumbar spine, and knees; degenerative disc disease, left shoulder impingement; obesity; sleep apnea; adjustment disorder, depression; and hypertension."  According to plaintiff:

> Ms. Summers suffers from impairments which give rise to non-exertional symptoms, including pain, postural limitations, sit/stand/walk limitations lifting/reaching limitations, the need for daily naps, and need to avoid frequent contact with the public, which combine to preclude her from performing substantial gainful activity.

Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 18, 2007, before Administrative Law Judge ("ALJ") L. Kalei Fong.   In a February 8, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1.    The claimant has the following severe impairments: degenerative lumbar disc disease, left shoulder impingement, obesity, alcohol abuse, adjustment disorder, sleep apnea treated with CPAP, hypertension controlled on treatment, and GERD;
>
> 2.    The claimant has the residual functional capacity to perform light work except she is limited to occasional stooping or crouching, no frequent forceful gripping/grasping or overhead reaching with the left upper extremity secondary to impingement, frequent handling is intact for light work, and no frequent public or co-worker contact;
>
> 3.    The claimant is able to perform her past relevant work as a residential counselor; and
>
> 4.    Considering the claimant's age, education, work experience, and residual functional capacity, the Medical-Vocational Guidelines indicate that there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on April 11, 2008, this appeal followed.

---

[1]    It appears that plaintiff previously applied for benefits in October 2003.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence , summarized chronologically below:

December 3, 2003 – Records from Sacramento Family Medical Clinic reveal that plaintiff was diagnosed with sleep apnea.  (CAR 303).

February 19, 2004 – Agency doctor Satish Sharma, M.D., reported on a comprehensive internal medicine examination.  (CAR 293-98).  Plaintiff was evaluated incident to complaints relating to sleep apnea and musculoskeletal pain.  As to the latter, the doctor reported on the following history provided by plaintiff:

> The claimant also complains of low back pain for the past five years.  She denies any history of trauma to the back.  The back pain at times radiates to the lower extremities, right more than left.  She also gives a history of intermittent numbness in the lower extremities.  She says that anytime she stands, walks, lifts anything, bends, or sits in one position for a long period of time she has low back pain.
>
> * * *
>
> She also complains of bilateral knee pain, right more than left.  She denies any history of trauma to the knees.  The knee pain is worse on prolonged standing and walking.  The knees have a tendency to give way and lock on her at times.

On physical examination, Dr. Sharma observed tenderness to palpation of the lumbar spine, but no paraspinous muscle spasm.  Straight leg raising was negative bilaterally.  He also observed that plaintiff's shoulder abduction was "180/180 degrees bilaterally."   The doctor provided the following functional assessment:

> Because of her history of chronic low back pain and intermittent radicular pain in the lower extremities as well as her bilateral knee pain and intermittent limp on the right lower extremity, the claimant should be limited in lifting to 10 pounds frequently, 20 pounds occasionally.  Bending and stooping should be done occasionally.  Standing and walking should be limited to 6 hours per day with normal breaks.  There are no limitations in holding, fingering, or feeling objects.  There are no limitations in speech, hearing, or vision.  She has a history of sleep apnea syndrome and should not drive.

/ / /

March 9, 2004 – An agency non-examining doctor submitted a physical residual functional capacity assessment.  (CAR 283-90).  The doctor opined that plaintiff could lift/carry up to ten pounds occasionally and 20 pounds frequently, sit/stand/walk for six hours in an eight-hour day, and push/pull without limitation.  The doctor also opined that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  No manipulative, visual, or communicative limitations were established.  As to environmental limitations, the doctor states that plaintiff should maintain "average cleanliness" with respect to exposure to fumes, odors, dusts, gases, etc.

May 20, 2004 – Agency non-examining doctor Antoine Dipsia, M.D., submitted a physical residual functional capacity assessment.  (CAR 274-81).  Dr. Dipsia opined that plaintiff could lift/carry up to ten pounds occasionally and 20 pounds frequently, sit/stand/walk for six hours in an eight-hour day, and push/pull without limitation.  The doctor also opined that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  No manipulative, visual, or communicative limitations were established.  Dr. Dipsia stated that plaintiff should avoid workplace exposure to fumes, odors, dusts, bases, etc., but otherwise did not assess any environmental limitations.

December 16, 2004 – Progress notes from Sacramento Family Medical Clinic reflect that plaintiff was being treated for sleep apnea.  (CAR 302).

January 18, 2005 – Agency doctor Will Ellis, M.D., performed a comprehensive internal medicine examination and prepared a report.  (CAR 268-73).  At the time of the evaluation, plaintiff's chief complaints were: sleep apnea; pain in the hand, legs, and back; and hypertension.  Regarding plaintiff's musculoskeletal complaints, Dr. Ellis reported the following history:

> . . . The claimant reports that she has had pain for the last 3-4 years.  Apparently she worked graveyard at a warehouse lifting boxes.  She also did housekeeping at children's homes and occasionally had to restrain fighting children.  She reports she developed a pinched nerve in her back with pain radiating to her leg about three years abo.  She was prescribed

analgesics.  She did not have an MRI or a CAT scan, but she did have back and shoulder x-rays.  She was prescribed Gabapentin, but did not receive any further relief.  She developed peptic ulcer disease and anti-inflammatories were discontinued and she has subsequently been on Tylenol.  She also reports that she started Tramadol three months ago with partial relief.  She has had no other treatment and reports no relief with heat or ice.  Her last physical therapy was in 2002 without relief.

Her current pain is a band of pain around her low back at about the L3 level.  It radiates down her right posterior leg to her ankle.  She reports occasionally the posterior aspect of her calf and plantar aspect of her foot are numb.  She has had incontinence for one year of an urge type.  The right foot seems to be weaker and she questions whether or not she has a limp.  She also reports for the last one year her left shoulder has ached after significant activity.  This ache is centered right over the joint and she reports on a few occasions her left arm has been numb, although she is able to shake this out and she denied any focal weakness.

As to daily activities, plaintiff reported that she occasionally helps with making her bed and simple meal preparation.  She also cares for her four-year-old grandson and 19-month-old granddaughter while her daughter is at work.

On physical examination, Dr. Ellis noted that plaintiff presented with a slight right-sided limp.  Straight leg raising was negative bilaterally and fine finger motions were intact.  Dr. Ellis observed normal motor strength on the right, but decreased on the left.  He noted that plaintiff is right-handed.  He observed "[s]ome atrophy" of the right leg.  The doctor provided the following functional assessment:

The claimant appears to ambulate with some mild difficulty.  The atrophy of her right leg appears to be significant.  I believe that the claimant would be able to ambulate for two hours during the course of the day and provided breaks probably somewhat more than that, although I believe it would be challenging for her to achieve about six hours during the course of the day.

Provided she is able to shift her weight occasionally, I believe that the claimant would be able to sit for six hours during the course of the day.

* * *

Given the claimant's shoulder impingement, as well as her back pain, it seems reasonable to limit lifting or carrying to 10 pounds frequently and 20 pounds occasionally.

///

5

1
2
> The claimant appears to have full range of motion, but some difficulty rising from a flexed spine position.  I believe it appropriate to limit bending, stooping, or crouching to occasionally.

3
4
> The claimant has some decreased grip strength on the left.  She also has positive impingement in her left shoulder.  I believe it would be appropriate to limit reaching with the left arm to occasionally and grasping objects with the left hand to occasionally.

5
6
> There are no relevant visual, communicative, or workplace environmental limitations identified.

7   October 21, 2005 – Treatment notes from Sacramento Primary Care reflect that

8   plaintiff complained of low back pain.  (CAR 240-41).

9   April 7, 2006 – Agency non-examining doctor C.E. Lopez, M.D., submitted a

10  physical residual functional capacity assessment.  (CAR 260-67).  The doctor opined that

11  plaintiff could lift/carry up to 20 pounds occasionally and up to ten pounds frequently.  Plaintiff

12  could stand/walk/sit for six hours in an eight-hour day with no restrictions.  Plaintiff's ability to

13  push/pull was unlimited.  The doctor concluded that plaintiff could perform all postural activities

14  frequently, except that plaintiff could only kneel and crawl occasionally.  Overhead reaching with

15  the left upper extremity was limited, as was plaintiff's ability to engage in frequent forceful

16  gripping/grasping.  The doctor opined that frequent basic handling was intact for light work.  No

17  visual, communicative, or environmental limitations were assessed.

18  April 19, 2006 – Plaintiff summarizes the treatment notes from Sacramento

19  Primary Care at CAR 237-38 as follows:

20
21
22
23
24
25
> April 19, 2006, medical records from Primary Care Center reflected that Ms. Summers had her medications refilled.  The record also reflected that she was "In a lot of pain" located in her left shoulder which had been continuing for two years and was exacerbated by activity, knee pains and low back pain, all of which were ongoing.  The record reflected that she had been using Tramadol for a few days and reported that she was very fatigued all the time and her sleep was non-restorative.  Records of the same date reflected that she appeared depressed and was obese.  The record also reflected that her depression was probably due to pain, and her shoulder and knee pain "may represent radiculopathy combined with rotator cuff syndrome."  She also reported low back pain.

26  / / /

6

1          July 3, 2006 – According to plaintiff, the treatment notes from Sacramento

2    Primary Care at CAR 235-36 show that "[s]he reported not wanting to use heavy pain medication

3    such as methadone because it caused constipation."   Plaintiff also states that the notes reflect

4    that Naprosyn helped with her shoulder pain, but not her knee and back pain.  Plaintiff told the

5    treating doctor that she was not taking prescribed Elavil for sleep "because it scared her."  The

6    doctor prescribed Norco and instructed plaintiff to continue with Elavil to help her sleep.

7          July 20, 2006 – William Stansell, M.D., prepared a report entitled "SSI History

8    and Physical Examination."  (CAR 248-51).  He described plaintiff's chief complaints as

9    follows:  "Painful joints – 'I hurt' – and depression."  Dr. Stansell outlined the following history,

10   as reported by plaintiff:

11         This 52-year-old African American female states she has pain in her
      lumbar spine plus her knees, right hip, and left shoulder for more than

12         three years.  No history of any significant injuries in the past.  There was
      gradual onset of these symptoms.  The lumbar pain is aggravated by

13         prolonged walking and standing and by heavy lifting.  She has pain in both
      knees, and the apartment she lives in involves going up and down stairs

14         frequently.  She has been able to walk and does so frequently, anywhere
      from two to three blocks in distance.  The patient's weight, formerly 195,

15         has decreased approximately ten pounds over the past several weeks,
      according to the patient.  Overall, the patient states she "hurts."

16

17         The patient states she has been depressed over the past couple of years.
      This has caused her to lose interest in her surroundings, and for the past

18         several months she has stayed inside a lot.  She states she just does not
      have the energy to do anything.  She admits to not feeling happy.  She was

19         married for seven years at one time, and has been separated for more than
      ten years.  She has had suicidal ideation in the remote past, but denies any

20         current thoughts.  She was recently scheduled to see a psychiatrist at the
      Visions clinic in follow-up.

21         The patient was diagnosed with sleep apnea in the year 2003.  She has
      been in a CPAP machine since then, but states she still has difficulties on

22         occasion.  She thinks she has had sleep apnea since at least 1999.  In the
      morning she still feels fatigued.  She does not seem to sleep well at night,

23         even though she has been on medication for this.

24         The patient is followed at Primary Care Clinic and treated for her chronic
      pain by Dr. Davis.  Currently she is on Norco and Neurontin, as well as

25         Naprosyn.  She feels her painful joints are not getting any better.

26   / / /

7

1   As to alcohol use, plaintiff reported the following to Dr. Stansell:

2           An occasional drink, beginning at age 18, progressing to one or two
            glasses of white wine a day.  She does not drink every day.  She has never
3           been inebriated or had any withdrawal problems.

4   Plaintiff also reported that she helps with household chores.

5           On examination, Dr. Stansell reported that "[f]unduscopic examination was

6   grossly within normal limits."  Plaintiff had good range of motion on forward flexion of her

7   back.  There was limited range of motion of the left shoulder, but all other joints were within

8   normal limits.  Straight leg raise was 90 degrees bilaterally, and plaintiff was able to heel-walk

9   without difficulty.  Plaintiff's thought content was appropriate and there was no evidence of

10  hallucinations, delusions, or active suicidal ideation.  Dr. Stansell diagnosed "arthralgias" in the

11  left shoulder, knees, and low back.  He also noted plaintiff's obesity and chronic depression by

12  her report.

13          Dr. Stansell's report was accompanied by an assessment of plaintiff's ability to do

14  work-related activities.  He opined that plaintiff's ability to relate to co-workers and the public,

15  function independently, maintain attention and concentration, and understand and carry out

16  complex job instructions was "fair."  He concluded that plaintiff's ability to deal with work

17  stressors was "poor."  He opined that plaintiff would frequently lift/carry up to ten pounds and

18  occasionally lift/carry up to 15 pounds.  The doctor stated that plaintiff could stand/walk for up to

19  four hours total for 15 minutes at a time without interruption.  He did not feel that sitting was

20  affected by plaintiff's impairments.  Plaintiff's ability to do overheard reaching activities with the

21  left shoulder was limited.

22          September 5, 2006 – Treatment notes from Sacramento Primary Care show that

23  plaintiff reported that "[t]oday is a better day for me" in terms of her pain.  (CAR 233).  Plaintiff

24  was continued on Naprosyn, Norco, and Elavil.

25  / /

26  / / /

1        October 3, 2006 – Treatment notes from Sacramento Primary Care reflect that

2    plaintiff's hip pain was improved with medication, though plaintiff still complained of impaired

3    mobility.  (CAR 232).

4        October 19/20, 2006 – Plaintiff answered questions posed by a marriage and

5    family therapist at Visions Unlimited incident to completion of an "Adult Comprehensive

6    Assessment / Client Plan."  (CAR 221-27).  Plaintiff stated she had no problems in the following

7    areas:  managing day-to-day life; completing household chores/responsibilities; completing

8    work-related tasks; and getting along with people outside the family.  She did report "a lot" of

9    problems with drinking alcohol, adjusting to stresses, relationships with family, apathy,

10   depression, fear, anxiety, memory, sleeping, and temper.  On mental status examination, plaintiff

11   was cooperative, calm, and direct.  Her sensorium was alert.  Her mood was dysphoric though

12   her affect was within normal limits.  Plaintiff's perception was also within normal limits.  Her

13   thought form was logical and thought content was within normal limits.  Plaintiff's speech was

14   clear and she was attentive.  Judgment and abstract thinking were adequate.  The therapist

15   assessed major depressive disorder and assigned a global assessment of functioning ("GAF")

16   score of 55 on a 100-point scale.

17       February 10, 2007 – Plaintiff submitted a "Function Report – Adult."  (CAR 110-

18   17).  Plaintiff described her typical day as follows:

19           Go to the bathroom and stay in bed.  Sometimes I sit up for a while then
             I'm back in bed.  I drink a couple of cups of tea almost every morning, say

20           my prayers, take all my morning pain medications, blood pressure pills,
             stomach pills, read the daily newspaper.  2 hours after I'm done with

21           taking my morning meds I'm very sleepy and tired and however severe my
             pain is in my back and knees I'm lying down in bed.

22

23   She stated that she does not care for anyone else and that she does not care for any animals.  She

24   stated that she has problems sleeping and is in a "lot of pain."  She added that pain medication

25   "doesn't always help me sleep because the pain I experience is greater so I'm always restless and

26   tired."  As to personal care, plaintiff stated that she needs help getting in and out of the bathtub

and cannot care for her hair.  Plaintiff stated that she "sometimes" prepares meals consisting of

sandwiches, soup, "or something I can cook quick in the microwave."  She stated that she cannot

stand for long periods of time and does not do any household chores because "I'm in too much

pain; I'm suffering from severe depression."  She stated that she does not go out alone or drive.

She stated she tries to go to church at least once a month "if I'm feeling up to it."

As to her capabilities, plaintiff stated she has difficulty lifting, squatting, bending,

standing, reaching, walking, kneeling, climbing, concentrating, remembering, understanding,

following instructions, and getting along with others.  She did not state that she had any problems

with sitting.  She stated that she cannot walk anywhere.  She added that she has problems getting

along with authority figures.  She stated she has problems breathing and uses a "C-PAP breathing

machine" which was prescribed in November 2003.

February 10, 2007 – Plaintiff also submitted a "Fatigue Questionnaire."  (CAR

121-22).  She stated that most of the day she stays in bed and has to take naps "2 to 4 times a

day."  She stated that it is hard for her to stand "for any long period of time."  She stated her

fatigue began in 2002 and became "more chronic" in February 2005.  She says her pain is so

severe she is easily distracted by it and "can't think properly or concentrate."

February 16, 2007 – The CAR contains a radiology report of x-rays on plaintiff's

lumbar spine, pelvis, right hip, and right knee.  (CAR 173-75).  As to the lumbar spine, the

impression was as follows:

> No change is noted in the lumbar spine findings.  There is degenerative
> disc disease at the L5-S1 level with mild narrowing at L4-5.  Degenerative
> apophyseal joint changes are prominent at L4-5 and L5-S1,

As to the pelvis, hip, and knee, no significant findings were revealed.

February 20, 2007 – Plaintiff submitted a "Pain Questionnaire."  (CAR 123-25).

She stated her pain is located in the lower back, left shoulder, right knee, and right hip.  Plaintiff

added that the pain prevents her "from standing and any type of physical movement for more

than a period of 30 minutes or more."  She stated the pain spreads to her ankles and left arm and

10

1   hand.  Although at one point she stated that the pain is constant, at another point she stated the

2   pain lasts "for hours."  She stated that neither rest nor medication relieves her pain.  Plaintiff

3   stated that medications cause dizziness and drowsiness and "lessen my ability to do any type of

4   activity."  She stated that she is able to walk to her mailbox, stand for "10 to 15 minutes," and sit

5   for 30 minutes at a time.   She stated that her family does all the household chores, including

6   laundry.

7           March 28, 2007 – Agency doctor Phillip Seu, M.D., conducted a comprehensive

8   internal medicine evaluation and prepared a report.  (CAR 213-17).  Dr. Seu evaluated plaintiff

9   relative to her complaints of low back pain going down the right leg as well as left shoulder pain.

10  As to her low back, plaintiff reported the following:

11          The claimant reported that she has had a two-year history of pain that
            begins in her mid lumbar region with the right side being worse than the
12          left and with radiation of pain to the right hip, right thigh, and right knee.
            She complains of severe burning pain that is constant.  She has taken
13          various medications with only partial relief.  She reported that the pain
            began after she did some work in a warehouse that involved lifting heavy
14          boxes.  She is currently unable to walk or stand for more than 15 minutes.
            She is unable to lift anything.  In addition she reported trouble moving her
15          leg because of pain in the right hip and right knee as well as swelling in
            the right leg.  She also complained of numbness in the thigh and tingling
16          and burning sensations at nighttime.  She has had x-rays done but is unsure
            of the results.  She has never had an MRI.  She reported that she never gets
17          relief from her symptoms but will sometimes try putting ice on her back or
            stretching her back.

18

19  As to her left shoulder, plaintiff reported:

20          The claimant reported that she has had pain in her left shoulder since 2004.
            She feels that this pain began when she worked as a cashier.  She reported
21          that she is unable to use her left arm to do things like lifting heavy objects.
            She also has trouble reaching over her head.  She has had medical
22          treatment with cortisone shots, once in September 2006 and once in
            January 2007, and these did not help.  She has had x-rays done but is
23          unsure of the results.  She has never had an MRI.  She complains of a
            burning sensation that radiates from her shoulder down her upper arm
24          towards her neck.  She does not complain of numbness or tingling in her
            left hand.

25

26  Plaintiff stated that "she spends most of her time sleeping because of pain."

                                            11

On physical examination, Dr. Seu noted that plaintiff is obese, standing 5'0" and weighing 187 pounds.  Plaintiff walked with a slight limp on the right side and had difficulty getting on and off the exam table, as well as getting up from a supine position.  Plaintiff refused to perform the Romberg test.  Plaintiff's upper extremity motor strength was 5/5 in the deltoids, biceps, triceps, and wrist flexors and extensors bilaterally.  Her lower extremity strength was also normal bilaterally.  Plaintiff's grip strength was 5/5 on the right and 4/5 on the left.  Plaintiff is right-handed.  Dr. Seu offered the following general findings:

> The claimant has moderate tenderness in her lumbar region with the right being worse than the left.  She has some paravertebral muscle spasms. She has decreased range of motion of her right hip as well as the lumbar region of the left shoulder.  There is mild tenderness around the left shoulder joint to deep palpation.

Dr. Seu diagnosed lumbosacral strain with tenderness, muscle spasm, and decreased range of motion of the lower back, as well as left shoulder impingement manifested by decreased range of motion of the left shoulder and pain.  The doctor opined that plaintiff could sit/stand/walk six hours in an eight-hour day, lift/carry up to 20 pounds occasionally and ten pounds frequently, and only occasionally bend.  Dr. Seu also assessed limitations to overhead reaching with the left arm.

April 10, 2007 – Non-examining agency doctor Patrick Bianchi, M.D., submitted a physical residual functional capacity assessment.  (CAR 194-201).  Dr. Bianchi concluded that plaintiff could occasionally lift up to 20 pounds, frequently lift up to ten pounds, sit/stand/walk for six hours in an eight-hour day, and push/pull with no limitation.  He opined that plaintiff should never climb ladders, ropes, or scaffolds, but that she could occasionally climb stairs.  He also concluded that plaintiff could occasionally balance, stoop, kneel, crouch, and crawl.  He found that plaintiff was limited to only occasional overhead reaching with the left arm.  No visual, communicative, or environmental restrictions were noted.

/ / /

/ / /

/ / /

1           <u>May 18, 2007</u> – Agency doctor Bradley Daigle, M.D., submitted a report

2    following a comprehensive psychiatric evaluation of plaintiff.  (CAR 207-11).  Dr. Daigle

3    reported the following history, as related by plaintiff at the time of the evaluation:

4            Ms. Summers left her last job in February 2005, working for Big Lots in
             the warehouse and as a cashier, after four months.  Her account of why she
5            left was rather contradictory, stating that she quit because she was "in too
             much pain," and then stating that she quit because "my hours were cut."
6            She states that she has not been looking for work because of chronic pain
             in her legs, hips, knees, and left shoulder.  She cannot describe any
7            specific injuries to these areas but she states that the doctors told her that
             she had "arthritis."  She also complains of chronic depression but provides
8            very little detail about this depression.  She tends to attribute it to being
             adopted which she found out about 10 years ago.  She states that she
9            recalls being depressed in her childhood because she was an only child.
             She was molested by her mother's boyfriend.  She is also a chronic
10           obsessive drinker and she is currently consuming one or two bottles of
             wine every day and has been doing so for the last year or two.  She states
11           that her family complains about her drinking but she has made no effort or
             attempt to obtain rehabilitation, has not gone to an AA meeting, and does
12           not appear to believe the drinking is a problem.  She complains of the
             depression, sadness, hopelessness, and she has had suicidal rumination but
13           no suicidal attempt, plan, or intent.  She had never been psychiatrically
             hospitalized.  She sleeps restlessly and awakens frequently.  She
14           occasionally has dreams about a man dressed in black pursuing her.  She
             has memory problems and concentration but she reads novels regularly.
15           She denies drug abuse.  She is seeing a counselor at Visions Unlimited and
             has been taking Wellbutrin for the last four to five months.  This is the
16           first time she has ever taken any psychiatric medications and she
             acknowledges that she doesn't take it every day.

17

18   Dr. Daigle noted in his report that plaintiff was convicted of welfare fraud in 1999.  As to daily

19   activities, Dr. Daigle reported:

20           She currently lives in Sacramento with her daughter and two
             grandchildren.  Her daughter is working at Quiznos Subs.  She doesn't
21           have a valid driver's license which has apparently been suspended.  She
             rarely goes out alone.  She doesn't have a boyfriend.  She takes care of her
22           own self-care.  She has limited household activities.  She doesn't like to
             baby-sit the grandchildren.  She enjoys reading novels and can discuss the
23           novels on Oprah's list.  She goes to church occasionally.  She watches a
             lot of TV and movies.

24

25   / / /

26   / / /

1         On mental status examination, Dr. Daigle observed that plaintiff's thought

2   processes were coherent and organized, with no tangentiality or loosening of associations.

3   Plaintiff's thought content was relevant and non-delusional, and her mood was depressed.  Dr.

4   Daigle stated that plaintiff's affect was subdued, sullen, and negativistic.  Plaintiff's intellectual

5   functioning, memory, fund of knowledge, and ability to perform calculations were all normal and

6   intact.  Dr. Daigle opined that plaintiff's insight and judgment were limited.  The doctor

7   diagnosed major depressive disorder, partially treated, and chronic alcohol abuse, untreated.  He

8   assigned a GAF score of 65.

9         Dr. Daigle offered the following discussion and prognosis:

10       Marlene Summers is a 53-year-old separated woman who has been
       depressed for at least the last couple of years and concurrently, has been
11       seriously abusing alcohol.  She has limited insight and does not appear
       motivated to quit drinking.  Additionally, although she has been on
12       antidepressant medication for the last four or five months, she is not taking
       it as prescribed and she is generally negativistic and poorly cooperative.
13       She is not suicidal but she appears to be reclusive and unmotivated.

14                * * *

15       Ms. Summers clearly has a treatable condition but she is not cooperating
       with treatment at the present time.  With adequate medication and an effort
16       to abstain from alcohol, I believe she would be able to return to work
       within the next six months, and moreover, work would be therapeutic for
17       her.

18   As to plaintiff's mental residual functional capacity, Dr. Daigle opined that plaintiff is not

19   significantly limited in ability to understand, remember, and carry our simple or complex

20   instructions.  He also opined that plaintiff is slightly limited in ability to maintain concentration,

21   attention, persistence, pace, and day-to-day regular attendance.  Plaintiff is also slightly limited in

22   her ability to adapt to the stresses common to work.  As to plaintiff's ability to relate to and

23   interact appropriately with co-workers and the public, Dr. Daigle stated that plaintiff was slightly

24   to moderately limited.

25   ///

26   ///

1          June 19, 2007 – Non-examining agency psychiatrist Lon Gottschalk, M.D.,

2   submitted a mental residual functional capacity assessment with psychiatric review technique

3   form.  (CAR 176-93).  Dr. Gottschalk concluded that plaintiff's mental impairment resulted in

4   mild limitation in activities of daily living, moderate difficulties in maintaining social

5   functioning, and mild difficulties in maintaining concentration, persistence, and pace.  The

6   evidence did not show any episodes of decompensation.  The doctor opined that plaintiff was

7   moderately limited in her ability to work in coordination with others, ability to interact

8   appropriately with the general public, ability to accept instructions and respond appropriately to

9   criticism, ability to get along with co-workers, and ability to maintain socially appropriate

10  behavior.  In all other areas, the doctor found that plaintiff was not significantly limited.  Dr.

11  Gottschalk provided the following functional assessment:

12              Claimant is able to sustain simple to complex tasks with limited public,
                co-worker contact.  She is able to adapt to changes in the work place.
13

14          October 19, 2007 – Treatment notes from Sacramento Primary Care indicate that

15  plaintiff requested a less powerful pain medication because she feared withdrawal symptoms if

16  she became unable to obtain morphine, which was being prescribed for pain.  (CAR 172).  No

17  objective findings are reflected in these treatment notes.

18          November 20, 2007 – Treatment notes from Sacramento Primary Care show that

19  plaintiff was being re-started on MS-Contin and given a trial of Naproxen for pain.  (CAR 169).

20          November 20, 2007 – Plaintiff's treating physician, Garth Davis, M.D., submitted

21  a form entitled "Medical Assessment of Ability to do Work-Related Activities (Physical)."

22  (CAR 160-62).  The doctor's primary diagnosis was "generalized osteoarthritis – shoulder,

23  lumbar spine, knees" and his secondary diagnosis was obesity.  He stated that his assessment was

24  based on "clinical history, exam & x-ray."  Dr. Davis opined that plaintiff's ability to walk,

25  stand, and sit was limited by "significant pain in knees."  Specifically, he opined that plaintiff

26  could walk and/or stand for less than one hour in an eight-hour day, and could sit for one or two

15

hours in an eight-hour day.  He did not cite any objective findings in support of this opinion.  As to lifting and/or carrying, Dr. Davis opined that plaintiff's capability was limited to occasionally lifting and/or carrying up to ten pounds.  He cited rotator cuff syndrome and decreased range of motion in support of this opinion.  Without citing any objective findings, Dr. Davis opined that plaintiff is partially restricted in her ability to climb, that she is restricted in her ability to bend and stoop, and that she required rest periods during the day.  Also without citing any objective findings, Dr. Davis stated that plaintiff has "depressive symptomatology related to chronic musculoskeletal pain."  Dr. Davis concluded that plaintiff could not work an eight-hour day due to musculoskeletal pain which "limit prolonged sitting, standing, interferes with concentration."  He did not expect plaintiff's condition to improve.

December 18, 2007 – Plaintiff testified at the administrative hearing in this case.  (CAR 438-64).  Plaintiff was represented by counsel at the time of the hearing.  Regarding the onset of her musculoskeletal pain, plaintiff testified as follows:

> A:      Well, after I left Children's Home [in 2001], I started experiencing some pains in my back and in my knees.  A few times when I worked at Children's Home, we had a few kids that would not take their meds and would attack other kids or attack, I've been attacked three times myself, which caused us to have to restrain them, and in the interim with me doing that, I fell a couple of time on my knees, on the floor, with the, you know, the kid.
>
> He was a lot bigger than I was, and then I just started experiencing a lot of pain in my body, my legs and my back, my shoulder and my knees, and as time went by, they, it just got worse and I had to take some time off from work from time to time, and then I just started doing temp work because I couldn't go on and working an eight-hour day job, so, you know, kind of, a 40-hour-a-week, I couldn't do, and so I would take temporary positions that, they were like maybe six hours a day.

Plaintiff testified that she receives Cortisone injections every two months for pain, and has been doing so for the past two years.   Regarding depression, plaintiff stated that she had been taking Bupropion (generic for Abilify) and Hydroxine for the past six months.  She said that the medication "help some" and "I don't cry as much as I did."  Plaintiff stated that she experiences depression about four times a week.  When asked by her attorney "has this four times a week

1  improved," plaintiff responded: "A lot."  Plaintiff also testified that all of her medications

2  produce side effects, such as dizziness and drowsiness.

3              As to daily activities, plaintiff stated that she doesn't do much housework,

4  including laundry, and that her daughter helps her care for her hair.  As to laundry, she later

5  testified that she sometimes takes items out of the dryer and will fold "towels and stuff like that"

6  while sitting on her bed.

7              Regarding alcohol use, the following exchange occurred:

8                  Q:    What about your alcohol –

9                  A:    Well, Your Honor –

10                 Q:    – were you being treated for that?

11                 A:    – at that, no, it, it wasn't that I had an alcohol addiction.  I
        had mentioned to her [the therapist from Visions Unlimited] several times
12      that I would occasionally drink Merlot, some Merlot and Chardine [sic], a
        glass or there's been occasion during, it was a holiday that I had a bottle,
13      but that was during the course of the day that I might have drank three or
        four bottles – three or four glasses, but it wasn't that I have an addiction to
14      alcohol, that wasn't, they misinterpreted if that's what they have written
        down, because I don't.  Everybody –

15                 Q:    Did you drink one to two bottles of wine daily?

16                 A:    No, not daily.  Maybe in the course of a week I might have
        had, on different occasions, but it wasn't a problem of alcohol being an
17      addiction at all.  And that was only for a couple of months during that
        summer, and after that, I rarely even, rarely drink at all. . . .

18

19  She stated that the last time before the hearing she had consumed any alcohol was at

20  Thanksgiving when she had one glass of wine with her dinner.

21              Undated – Plaintiff's friend, James E. Hunter, submitted a "Function Report –

22  Adult."  (CAR 102-09).  As to how plaintiff spends a typical day, Mr. Hunter stated:

23              Lies in bed for a while, watches T.V., finds something already cooked,
        eats a little of what someone has prepared, she'll shower, take some of the
24      medications she's been given, and lay back down in her room which is
        pitch black, then watch more television, sleeps a lot.

25

26  / / /

He added that plaintiff is always tired.  He stated that plaintiff also cares for a dog with the assistance of family members.  Mr. Hunter stated that plaintiff has "no problem" with personal care.  He stated that plaintiff prepares her own meals, which consist of sandwiches and frozen dinners, but when asked how often he responded "never."  As to housework, Mr. Hunter stated that plaintiff does "just laundry."  He stated that plaintiff does not drive and rarely goes out and, when she does go out of the house, she never goes alone.  He stated, however, that plaintiff attends church.

Regarding plaintiff's capabilities, Mr. Hunter stated that plaintiff has difficulty lifting, walking, climbing, standing, bending, sitting, kneeling, understanding, and completing tasks.  He also stated that plaintiff has difficulty getting along with others.  Specifically, Mr. Hunter stated: "cause at one moment she's peaceful very moody and at time she thinks they don't like her and she shuts down."  He stated that plaintiff can walk "maybe a block."

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the

1   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

2   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

3   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

4   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

5   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

6   Cir. 1988).

7

8                                          **IV.  DISCUSSION**

9           Plaintiff argues: (1) the ALJ improperly rejected the opinions of Dr. Davis; (2) the

10  ALJ failed to properly credit plaintiff's statements or those from the third-party source; (3) the

11  ALJ erred in concluding that plaintiff could perform her past relevant work; and (4) if plaintiff

12  could not perform her past relevant work, the ALJ erred in applying the Medical-Vocational

13  Guidelines in lieu of obtaining vocational expert testimony.[2]

14          **A.      Evaluation of Dr. Davis' Opinion**

15          The weight given to medical opinions depends in part on whether they are

16  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

17  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

18  professional, who has a greater opportunity to know and observe the patient as an individual,

19  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

20  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

21  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

22

23          [2]      As to plaintiff's last two arguments, it follows that if plaintiff could perform her
    past relevant work, there could have been no error in applying the Medical-Vocational
    Guidelines.  Similarly, if the ALJ properly applied the Medical-Vocational Guidelines, it would
24  not matter whether the ALJ erred in concluding that plaintiff could perform her past relevant
    work.  The court notes that, in its cross-motion for summary judgment, defendant argues that the
25  ALJ properly concluded that plaintiff could perform her past relevant work and, therefore, does
    not address the ALJ's application of the Medical-Vocational Guidelines as an alternative basis to
26  conclude that plaintiff is not disabled.  The court will nonetheless consider both issues.

                                                    19

1   (9th Cir. 1990).

2          In addition to considering its source, to evaluate whether the Commissioner

3   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

4   in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

5   uncontradicted opinion of a treating or examining medical professional only for "clear and

6   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

7   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

8   by an examining professional's opinion which is supported by different independent clinical

9   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

10  1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

11  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

12  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

13  the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

14  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

15  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

16  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

17  without other evidence, is insufficient to reject the opinion of a treating or examining

18  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

19  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

20  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

21  see also Magallanes, 881 F.2d at 751.

22          The ALJ addressed Dr. Davis' opinions as follows:

23      The undersigned has also considered the assessment of Garth Davis, M.D.,
        of Primary Care Center prepared for her hearing and gives it no weight.
24      Dr. [Davis] stated the claimant has generalized osteoarthritis in her
        shoulder, lumbar spine, and knees, as well as obesity.  Dr. Davis stated her
25      ability to sit was one to two hours, stand or walk less than one hour,
        affected by significant pain in both knees (Ex. 168F).  However, x-rays
26      note no significant findings in her knees, hips, or lower extremities (Ex.

20

1   155F) and the lumbar views indicate DDD at L5-S1 with mild narrowing
    at L4-5; pelvis and right hip shows no acute bony abnormalities (Ex.
2   156F).  Dr. Davis continued to state that claimant could not lift/carry even
    less than 5 pounds due to rotator cuff syndrome but examinations by other
3   physicians have revealed only mild limitation in her shoulder and these
    limitations have been taken into account in determining her residual
4   functional capacity.  The extreme limitations that Dr. Davis noted are
    inconsistent with the [objective] findings and are not credited.

5

6   Plaintiff argues that "[t]he ALJ's characterization of Dr. Davis's assessment was inaccurate and

7   misleading."  Specifically, plaintiff states that an x-ray of plaintiff's back "documented

8   significant findings" supporting Dr. Davis' assessment regarding limitation on plaintiff's ability

9   to sit and stand.  Plaintiff also states that her obesity, which was noted by Dr. Davis, "no doubt

10  contributed to and exacerbated the pain in her knees and associated [sit/stand] functional

11  limitations."  As to Dr. Davis' lift/carry assessment, plaintiff argues:

12              . . . Lastly, contrary to the ALJ's assertions, Dr. Davis did not state
        that Ms. Summer could not lift/carry even 5 pounds.  It was Dr. Davis's
13      opinion that Ms. Summers was limited to lifting less than 5-10 pounds on
        an occasional basis based on his medical findings of "rotator cuff
14      syndrome in right arm, s/p steroid injections, and decreased ROM."  TR
        161.  Dr. Davis' s assessed limitations were based on his treatment of Ms.
15      Summers over a two year period, his clinical findings, radiological
        evidence, and medical judgment.  The ALJ's articulated reasons for
16      discrediting Dr. Davis's treating opinions were factually incorrect, not
        supported by the record, and without merit.  (citation omitted).

17

18  Finally, plaintiff contends that "the ALJ turned the hierarchy of physician evidence on its head"

19  by rejecting Dr. Davis' opinions in favor of those from non-treating and/or non-examining

20  sources.

21              Addressing plaintiff's last argument first, the factual basis for the argument – that

22  the ALJ relied on the opinions of non-treating and/or non-examining sources – is flawed.   The

23  ALJ clearly referenced the objective findings reflected in "examinations by other physicians."

24  Thus, the ALJ relied at least in part on the opinions of examining sources to reject Dr. Davis'

25  opinion.

26  / / /

21

1          Here, Dr. Davis' opinion is contradicted by those of examining doctors, namely

2   Drs. Sharma, Ellis, Seu, and to a lesser extent Dr. Stansell.[3]   Because the treating source opinion

3   from Dr. Davis is contradicted by the opinions of examining sources, the ALJ need only provide

4   specific and legitimate reasons supported by substantial evidence in the record for rejecting Dr.

5   Davis' opinion.   The ALJ cited the following reasons for rejecting Dr. Davis' opinion: (1) the

6   assessed sit/stand/walk limitation is not supported by the x-ray evidence; and (2) the assessed

7   lift/carry limitation is inconsistent with the objective findings of the examining sources.   These

8   are specific and legitimate reasons.   The question before the court is whether the ALJ's analysis

9   is supported by substantial evidence.

10              1.       Sit/Stand/Walk Limitation

11          As to limitations on plaintiff's ability to sit, stand, and walk, Dr. Davis opined that

12   plaintiff could walk and stand for less than one hour in an eight-hour workday, and that plaintiff

13   could sit for one to two hours.   The ALJ rejected this opinion and concluded that plaintiff could

14   sit/stand/walk up to six hours in an eight-hour workday.   This conclusion is consistent with those

15   of Drs. Sharma and Seu, both of whom examined plaintiff and noted essentially normal findings.

16   On physical examination Dr. Sharma observed no paraspinous muscle spasm, negative straight

17   leg raising bilaterally, and normal bilateral shoulder abduction.   While Dr. Seu observed a slight

18   limp and that plaintiff had some difficulty getting on and off the exam table, the doctor reported

19   normal lower extremity motor strength bilaterally.   The ALJ's conclusion with respect to sitting

20   is also supported by the opinions reached by Drs. Ellis and Stansell.   On physical examination,

21   Dr. Ellis noted right leg atrophy but observed negative straight leg raising bilaterally.   Dr. Ellis

22   opined that plaintiff could sit for up to six hours provided she could shift her weight.   On

23   physical examination Dr. Stansell noted negative straight leg raising and that plaintiff could heel-

24   toe walk without difficulty.   Dr. Stansell concluded that plaintiff could sit without limitation.

25   _____

26       [3]       Dr. Davis' opinion is also contradicted by the opinions of non-examining doctors.

1  The ALJ's sit/stand/walk assessment is also consistent with those of the non-examining doctors.

2          Regarding the x-ray evidence, the ALJ references x-rays taken on February 16,

3  2007, of plaintiff's lumbar spine, right hip, right knee, and pelvis.  No significant findings were

4  noted in the pelvis, right hip, or right knee.  As to the lumbar spine, the x-ray revealed

5  degenerative disc disease at the L5-S1 level with mild narrowing at L4-5.  Degenerative joint

6  changes were observed at L4-5 and L5-S1.  And, as the ALJ noted, the x-rays showed no

7  evidence of disc compromise or fracture.  Despite these findings, not a single doctor – except Dr.

8  Davis – opined any significant limitation related to the lumbar spine.  Specifically, as discussed

9  above, the doctors almost uniformly agreed with the ALJ's assessment that plaintiff could sit/

10  stand/walk for up to six hours in an eight-hour workday.

11          Finally, Dr. Davis' opinion of such an extreme sit/stand/walk limitation is not

12  supported by his own objective observations.  None of the treatment notes reveal the results of

13  objective testing data which would tend to support Dr. Davis' conclusion, and Dr. Davis does not

14  cite to any such data in his November 2007 assessment.

15              2.    <u>Lift/Carry Limitation</u>

16          The ALJ concluded that plaintiff could lift and carry up to ten pounds frequently

17  and 20 pounds occasionally, rejecting Dr. Davis' opinion that plaintiff could only occasionally

18  lift up to 20 pounds due to rotator cuff syndrome.  As with the sit/stand/walk limitation, the court

19  finds that the ALJ's conclusion is supported by substantial evidence.  Every doctor who

20  examined plaintiff – Drs. Sharma, Ellis, Stansell, and Seu – agreed that plaintiff could frequently

21  lift up to ten pounds.  Drs. Sharma, Ellis, and Seu also agreed that plaintiff could occasionally lift

22  up to 20 pounds.  Further, the conclusions reached by every non-examining doctor support the

23  ALJ's analysis.

24  / / /

25  / / /

26  / / /

1    Only Dr. Stansell's opinion differs, and only as to the amount of weight plaintiff

2  can occasionally lift and/or carry.  Dr. Stansell concluded that plaintiff could occasionally lift/

3  carry up to 15 pounds.  As to Dr. Stansell, the ALJ stated:

4    The undersigned has also considered the opinion[] of William Stansell,
     M.D., of Sacramento County Department of Health & Human Services
5    who opined in July 2006 that the claimant could only lift/carry ten pounds
     frequently and 15 pounds occasionally. . . .  However, Dr. Stansell noted
6    the claimant's findings were only consistent with arthralgia and noted she
     had good range of motion of her back on forward flexion with straight leg
7    raising to 90 degrees bilaterally, normal toe-walk and heel-walk, and
     normal neurological examination.  She had modestly limited range of
8    motion of her left shoulder consistent with her limitation to no frequent
     overhead reaching with her left upper extremity but all other joints were
9    within normal limits, including her right upper extremity and both lower
     extremities. . . .

10

11  The ALJ did not credit Dr. Stansell's lift/carry limitation because it was not consistent with the

12  minimal objective findings.  Not only was this an appropriate reason, the ALJ was entitled to

13  resolve the conflict between Dr. Stansell's opinion and those of every other doctor (except Dr.

14  Davis) in favor of the conclusion supported by the bulk of the objective evidence.

15    **B.    Credibility Assessments**

16    Plaintiff challenges the ALJ's assessment of her own statements and testimony, as

17  well as third-party statements by her friend, James E. Hunter.

18    The Commissioner determines whether a disability applicant is credible, and the

19  court defers to the Commissioner's discretion if the Commissioner used the proper process and

20  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

21  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

22  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

23  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

24  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

25  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

26  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

   If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

   The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

/ / /

In determining whether a claimant is disabled, an ALJ generally must also consider lay witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at 919.

1.      Plaintiff's Statements

Regarding plaintiff's credibility, the ALJ stated:

> . . . [T]he undersigned has also considered the claimant's testimony of pain, trouble breathing, significant depression, and inability to engage in work activity and finds her testimony less than credible.  The claimant testified she does light housework and also told Dr. Stansell that she walks frequently, anywhere from two to three blocks in distance and also goes up and down stairs frequently at her home.  She told Dr. Daigle that she does her own self-care, does limited household activities, attends church occasionally, enjoys reading and watching TV.  Such activities do not indicate a disabling impairment of the claimant's residual functional capacity for all work activity.  No significant atrophy, neurological deficits, radicular pain, weakness, reflex absence, or decreased sensation were reported.  She has not participated in the treatment normally associated with a severe pain syndrome, i.e., physical therapy, TENS, pain management clinic, etc., and doesn't always take her medication as prescribed.  In fact, she has been described as generally poorly cooperative and less than credible in her statements regarding her alcohol use.  She betrayed no evidence of more than mild pain or discomfort while testifying at the hearing.  While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.  Finally, the type, dosage, and side effects of medication employed to treat her impairments would not preclude her from performing work at a light exertion level.  On the basis of the foregoing, the undersigned concludes her allegations of limitations precluding even a narrow range of light work with limited public and co-worker contact are unsupported by the evidence.

///

26

1   Plaintiff contends that the ALJ erred by conceding that her medically determinable impairments

2   could be expected to cause the alleged symptoms and limitations, but then rejecting her

3   testimony as to the degree of limitations alleged.  She also argues that the ALJ mischaracterized

4   the testimony regarding her daily activities.

5         The court does not agree.  As the ALJ correctly noted in the hearing decision:

> Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:
>
> 1.  The claimant's daily activities;
>
> 2.  The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
>
> 3.  Factors that precipitate and aggravate the symptoms;
>
> 4.  The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
>
> 5.  Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
>
> 6.  Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7.  Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

The ALJ properly based her credibility assessment on these factors.  For example, the ALJ noted

that there was no evidence of significant atrophy, neurological deficits, radicular pain, weakness,

reflex absence, or decreased sensation.  The ALJ also noted that plaintiff has not participated in

the treatment normally associated with a severe pain syndrome, such as physical therapy, use of a

TENS unit, or pain management techniques.  The ALJ further noted that plaintiff doesn't always

take her medication as prescribed.  Even if the ALJ mischaracterized the extent of plaintiff's

daily activities, these other factors support the ALJ's credibility assessment.

27

1    Moreover, as the ALJ suggested and the record reveals, plaintiff's various

2 statements concerning her activities are inconsistent.  For example, plaintiff reported to Dr. Ellis

3 in January 2005 and Dr. Daigle in May 2007 that she cares for her four-year-old grandson and

4 19-month-old granddaughter while her daughter is at work.  Not only are the tasks associated

5 with childcare inconsistent with plaintiff's testimony of debilitating symptoms, the statements to

6 Drs. Ellis and Daigle are inconsistent with other statements made by plaintiff.  Specifically, in a

7 February 2007 Function Report, plaintiff stated that she did not care for anyone else.  By way of

8 another example of inconsistency, plaintiff told Dr. Stansell in July 2006 that she went up and

9 down stairs at her apartment complex frequently, and frequently walks from two to three blocks

10 in distance.  However, in the February 2007 Function Report plaintiff stated that she has

11 difficulty climbing and cannot walk anywhere.  In October 2006 plaintiff answered questions

12 posed by a therapist at Visions Unlimited regarding her limitations.  Plaintiff stated she had no

13 problems with completing household chores, work-related tasks, or getting along with people

14 outside the family.  However, as discussed above, plaintiff has repeatedly stated that she has

15 difficulty with almost all household chores.  She also stated in the Februay Function Report that

16 she had trouble getting along with authority figures.  The ALJ correctly found plaintiff not

17 credible.

18              2.    Mr. Hunter's Statements

19    As to Mr. Hunter, who submitted a third-party report on plaintiff's functional

20 abilities, the ALJ stated:

21         . . . [T]he undersigned has also considered the statement of James E.
         Hunter, the claimant's friend.  The undersigned notes there are a some
22         inconsistencies in his statements of the claimant's abilities compared to
         her statement of her abilities, i.e., she testified she needs help with getting
23         into the bathtub, washing her hair, and sometimes with dressing but he
         stated she has no problems with personal care; she stated she doesn't do
24         meal preparation and he stated she prepared sandwiches and frozen
         dinners; he stated she just does laundry but she indicated she is able to do
25         light housekeeping and also told Dr. Daigle that she does her own self-
         care, does limited household activities, and attends church occasionally.
26         His statement is not credited due to these inconsistencies as well as the

28

1        fact that the claimant's testimony was less than credible and his statement
would not support a conclusion that she is unable to perform even a
2        narrow range of light work with limited public and co-worker contact.

3  Plaintiff argues that the ALJ "found inconsistencies where no actual inconsistencies existed."

4        Again, the court does not agree.  Plaintiff stated in a February 2007 Function

5  Report that she does not care for any animals.  Mr. Hunter, however, stated that plaintiff cares for

6  a dog with the assistance of her family.  In the same February 2007 report, plaintiff stated that she

7  needs assistance getting in and out of the bathtub and cannot care for her own hair.  Plaintiff

8  added in a February 2007 Pain Questionnaire that her daughter helps her with her hair.  But Mr.

9  Hunter stated that plaintiff has "no problem" with personal care.  In the February 2007 Function

10  Report, plaintiff stated that she cannot walk anywhere.  Mr. Hunter, however, stated that plaintiff

11  can walk "maybe a block."  As to household chores, plaintiff stated in the Pain Questionnaire

12  that she did only limited laundry consisting of folding "towels and stuff like that" while sitting on

13  her bed.  Mr. Hunter stated that plaintiff's household chores consist of "just laundry," but he did

14  not specify any limitations on plaintiff's ability to do laundry.

15       **C.**    **Past Relevant Work**

16        As to plaintiff's ability to perform past relevant work, the ALJ stated:

17        The claimant has past relevant work as a residential counselor, retail clerk,
and clerical.  The claimant's past relevant work as a residential counselor
18        would not be precluded based on her restrictions.  Accordingly, the
claimant is able to perform past relevant work. . . .
19

20  Plaintiff argues:

21        . . . This finding was totally contradicted by the record.  Ms.
Summers testified that as a residential counselor/aid at [Children's Home]
22        she did cooking and cleaning for 12 boys with emotional problems and
that prior to that she worked at the Sacramento Job Corp. as a residential
23        counselor/aid supervising 21 girls who ranged in age from 16 to 24.  TR
445.  She testified that she had to restrain residents who attacked other
24        residents, and defend herself from attacks.  TR 446-47.  She reported that
she had to "prepare meals, snacks, did laundry, group meetings, monitor
25        dorm rooms, put up supplies, assist in group outings, write-up nightly
reports" and "put kids in restraints when they became violent."  TR 387.
26        Clearly, this job involved constant contact with people – an activity

1
2
3

       precluded by the ALJ's limitation to no frequent contact with the public.
Second, restraining emotionally disturbed residents would involve forceful
gripping/grasping and overhead reaching – activities clearly precluded by
her back and shoulder impairment.  Indeed, she testified that she had to
leave this job because the job activities exacerbated her pain.  *Id.*

4  Defendant concedes that the residual functional capacity outlined by the ALJ would preclude

5  plaintiff from performing her past work as a residential counselor/aid for the boys at Children's

6  Home.  Specifically, defendant states: "Plaintiff may not have been able to return to her work at

7  the Children's Home, but she could clearly perform her past work at Sacramento Job Corp."

8         As to the job at Sacramento Job Corp., defendant is correct that the ALJ is entitled

9  to rely on plaintiff's description in determining the demands of past work.  See SSR 82-62.  At

10  the administrative hearing, plaintiff provided the following testimony concerning this job:

11
12
13
14

       A:    I worked at Sacramento Job Corp., residential, residential
aide I guess you'd say.  There were 21 girls, age 16 to 24.  I did filing, we
did cleaning of the dorms.  I worked graveyard so I just oversaw the dorm
at night until eight in the morning, make sure the girls got up and did their
chores with the cleaning, and we'd have dorm meetings, and that's about
it, clean –

             * * *

15
16

       A:    And that was graveyard, I worked graveyard at night.

17  In a December 31, 2003, Work History Report, plaintiff listed a job as a "Residential Advisor

18  Graveyard Shift."  As to this job, she stated:

19
20

       Supervise a female dorm ages 16 yrs. to 23 yrs. old, write reports, update
files, facilitate group meetings, monitor rooms every hour, supervise
chores, provide a safe environment.

21  In the margin plaintiff added: "Clean my office."  She stated this job involved four hours of

22  walking, 20 minutes each of standing and kneeling, three hours each of sitting and writing/

23  typing or handling of small objects, and 10 minutes each of climbing and handling/grabbing/

24  grasping large objects.  She stated that the job required her to lift and carry supplies such as toilet

25  paper, soap, and other personal hygiene items for the girls living in the dorm.  She said she spent

26  up to two hours during her shift supervising the girls in the dorm.  Finally, plaintiff stated that

1    she was the "lead worker of my dorm on my shift."

2            Initially, the court notes that plaintiff appears to attribute the descriptions of the

3    Children's Home job to the Sacramento Job Corp. job.  Specifically, in her argument plaintiff

4    states that she worked at the Sacramento Job Corp. and then immediately thereafter cites to page

5    387 of the CAR and refers to restraining residents, attacks, preparing meals, and doing laundry.

6    This page of the record, however, is plaintiff's description of the job at the Children's Home.

7    The only descriptions of the job at the Sacramento Job Corp. are those summarized above.

8            The question is whether plaintiff's description of her duties for the Sacramento

9    Job Corp. job – which is the only information which was available to the ALJ as to this past

10   relevant work – is consistent with plaintiff's residual functional capacity.  The ALJ described

11   plaintiff's residual functional capacity as follows:

12           The claimant has the residual functional capacity to perform light work
             except she is limited to occasional stooping or crouching, no frequent
13           forceful gripping/grasping or overhead reaching with the left upper
             extremity secondary to impingement, frequent handling is intact for light
14           work, and no frequent public or co-worker contact.

15   The court finds that this residual functional capacity would not permit plaintiff to perform her

16   past relevant work at the Sacramento Job Corp.  Specifically, the ALJ restricted plaintiff to jobs

17   with "no frequent . . . co-worker contact."  In the Sacramento Job Corp. job, plaintiff was "lead

18   worker" on her shift.  This suggests that there were other subordinate workers on the same shift

19   whom plaintiff supervised as "lead worker."  Thus, the job involved potentially frequent co-

20   worker contact and there is no evidence upon which the ALJ could have relied to conclude that

21   plaintiff's past relevant work did not involve contact with co-workers or that such contact was

22   infrequent.  Based on the information available, the ALJ erred in concluding that plaintiff's

23   limitation to no frequent co-worker contact did not preclude this job.

24   / / /

25   / / /

26   / / /

31

1              **D.      Application of the Medical-Vocational Guidelines**

2              Assuming the ALJ erred in concluding that plaintiff could perform her past

3    relevant work, plaintiff argues that the ALJ also erred in applying the Medical-Vocational

4    Guidelines because non-exertional limitations required the ALJ to obtain vocational expert

5    testimony.  Specifically, plaintiff contends that the following limitations precluded application of

6    the Grids: "chronic pain, sit/stand/walk limitations, lifting/reaching limitations, the need for daily

7    naps, and limited public contact."  As discussed above, plaintiff's testimony as to chronic pain

8    was properly found not credible and the evidence does not support the sit/stand/walk or lifting

9    limitations opined by Dr. Davis.  Therefore, the court will address plaintiff's argument regarding

10   application of the Grids in the context of plaintiff's reaching and public/co-worker contact

11   limitations as well as alleged need for daily naps.  Defendant does not address this argument

12   other than to say:  "Notwithstanding the ALJ's alternative finding at Step 5, the ALJ properly

13   found that Plaintiff could perform her past work as a residential counselor (TR 20-21), thus it

14   was unnecessary for the ALJ to elicit the testimony of a VE."

15             The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

16   disability for various combinations of age, education, previous work experience, and residual

17   functional capacity.  The Grids allow the Commissioner to streamline the administrative process

18   and encourage uniform treatment of claims based on the number of jobs in the national economy

19   for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

20   460-62 (1983) (discussing creation and purpose of the Grids).

21             The Commissioner may apply the Grids in lieu of taking the testimony of a

22   vocational expert only when the Grids accurately and completely describe the claimant's abilities

23   and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

24   Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

25   Grids if a claimant suffers from non-exertional limitations because the Grids are based on

26   / / /

32

1   exertional strength factors only.[4]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

2   "If a claimant has an impairment that limits his or her ability to work without directly affecting

3   his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

4   by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

5   Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

6   even when a claimant has combined exertional and non-exertional limitations, if non-exertional

7   limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

8   1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

9           In cases where the Grids are not fully applicable, the ALJ may meet his burden

10  under step five of the sequential analysis by propounding to a vocational expert hypothetical

11  questions based on medical assumptions, supported by substantial evidence, that reflect all the

12  plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

13  where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

14  ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

15  1341 (9th Cir. 1988).

16  / / /

17

18          [4]       Exertional capabilities are the primary strength activities of sitting, standing,
    walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
19  perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
    P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
20  and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
    C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a
21  time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R.
    §§ 404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a
22  time with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R.
    §§ 404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a
23  time with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R.
    §§ 404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
24  100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
    See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
25          Non-exertional activities include mental, sensory, postural, manipulative, and
    environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R.,
26  Part 404, Subpart P, Appendix 2, § 200.00(e).

As to application of the Grids, the ALJ stated:

> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.14.  However, the additional limitations have little or no effect on the occupational base of unskilled light work.  The claimant's limitation to occasional stooping/crouching has only a slight effect on the occupational base.  Social Security Ruling 85-15 (SSR 85-15) provides that stooping, kneeling, crouching, and crawling are progressively more strenuous forms of bending parts of the body.  If a person can stoop, kneel, and crouch occasionally in order to lift objects, the sedentary and light occupational bases are virtually intact.  Her limitation on no frequent overhead reaching with the left upper extremity does not significantly erode the full range of light work as she is only slightly limited, has no limitations on the use of [her] right upper extremity, and basic handling and reaching are intact for light work.  SSR 85-15 also provides that unskilled jobs ordinarily involve primarily dealing with objects, rather than people or data, so her limitation to limited public or co-worker contact does not significantly erode the full range of light work.  Further, her limitation to unskilled work does not significantly erode the full range of light work as the Medical-Vocational Guidelines identify approximately 1,600 separate sedentary and light occupations, each representing numerous jobs in the national economy, which do not require skills or previous experience and which can be performed after a short demonstration or within 30 days.  Accordingly, these limitations do not significantly erode the full range of light work.  A finding of "not disabled" is therefore also appropriate under the framework of this rule.

Here, the ALJ found that non-exertional limitations, such as the restriction on contact with the public and co-workers and limitation on frequent overhead reaching with the left upper extremity, did not sufficiently erode plaintiff's exertional capabilities to preclude application of the Grids.  As to naps, the ALJ concluded that plaintiff was not limited in this regard.

### 1.   Contact with the Public and Co-Workers

Citing SSR 85-15, the ALJ concluded that, because unskilled jobs "ordinarily involve primarily dealing with objects, rather than people. . .," plaintiff's limitation to no frequent public or co-worker contact did not significantly affect plaintiff's ability to perform the exertional demands of the full range of light unskilled work.  Plaintiff cites Bruton v. Massanari, 268 F.3d 824 (9th Cir. 2001), and argues that the ALJ is required to use the services of a vocational expert where the medical evidence suggests that a claimant's impairments may

1    amount to a non-exertional impairment.  Plaintiff concludes that her limitation to only infrequent

2    contact with the public or co-workers is a non-exertional limitation triggering the need for

3    vocational expert testimony.

4            Plaintiff's reliance on Bruton is misplaced.  In Bruton, the Ninth Circuit re-stated

5    the rule outlined above that "'significant non-exertional impairments . . . may make reliance on

6    the grids inappropriate.'"  Id. at 828 (citing Desrosiers v. Sec'y Health & Human Servs., 846 F.2d

7    573, 577 (9th Cir. 1988)).  The medical evidence in Bruton indicated that the plaintiff was

8    precluded from "prolonged carrying, forceful pushing and pulling, and work *at or above the*

9    *shoulder level*."  Bruton, 268 F.3d at 828 (emphasis in original).  While the court did state that

10   the inability of a claimant to lift his arms above ninety degrees may be considered a non-

11   exertional limitation, and that the evidence suggested this particular limitation, see id., Bruton is

12   distinguishable from this case because, here, there is no suggestion of a significant non-exertional

13   limitation in relation to the physical work plaintiff can do.  In particular, and as the ALJ

14   observed, plaintiff is physically capable of unskilled light work which involves primarily contact

15   with objects and not the public.  Given primary contact with objects, the public contact involved

16   in work plaintiff can do would be infrequent.  Because plaintiff is capable of infrequent public

17   and co-worker contact, there is no evidence of a significant non-exertional limitation affecting

18   plaintiff's ability to perform unskilled light work.

19                    2.    Overhead Reaching with the Left Upper Extremity

20           As with plaintiff's limitation on public and co-worker contact, the ALJ cited SSR

21   85-15 and concluded that plaintiff's left upper extremity limitation does not preclude application

22   of the Grids.  Plaintiff again relies on Bruton.  And again the court finds this reliance to be

23   misplaced.  While Bruton involved the suggestion of a significant non-exertional impairment

24   based on evidence the plaintiff could not perform any work at or above shoulder level, there is no

25   such evidence here.  Rather, the limitation found by the ALJ and supported by the evidence is a

26   limitation to no frequent forceful overhead reaching with the left upper extremity.  Thus, plaintiff

1   is capable of infrequent forceful overhead reaching with the left upper extremity, frequent non-

2   forceful overhead reaching with the left upper extremity, and any overhead reaching with the

3   right upper extremity.  With these capabilities, the limitation identified by the ALJ does not

4   represent a significant non-exertional limitation on plaintiff's ability to perform unskilled light

5   work.

6              3.    Daily Naps

7              Plaintiff alleges that her condition (presumably her sleep apnea) requires her to

8   take daily naps.  The ALJ addressed plaintiff's sleep apnea and concluded that she does not have

9   any work-related limitations as a result of this impairment.  Specifically, the ALJ stated:

> The medical evidence shows the claimant has a history of snoring and was
> diagnosed with obstructive sleep apnea in July 2003 and the evaluator
> noted it was resolved with a CPAP at 8 cm of water pressure.  After
> multiple discussions, the claimant refused to use the CPAP but finally
> agreed to try the CPAP after seeing Ernest E. Johnson, M.D., ENT
> specialist in August 2003.  Satish Sharma, M.D., evaluated the claimant in
> February 2004 for an earlier application and noted she had a history of
> sleep apnea syndrome with complaints of feeling tired but did not note any
> limitations related to this condition.  Medical records of Dr. Nicholas
> Forde, M.D., of Sacramento Family Medical Clinic for December 2004
> noted the claimant was not using her CPAP machine regularly at night.  A
> consultative evaluation by Will Ellis, M.D., in January 2005 revealed the
> claimant told him she was using her CPAP machine every night in contrast
> to her statement to Dr. Forde. . . .

18   It is significant to note that plaintiff does not challenge the ALJ's analysis of the medical

19   evidence relating to her sleep apnea.  As the ALJ observed, the evidence suggests that plaintiff

20   was not consistently using the CPAP machine provided for treatment of her sleep apnea.

21   Moreover, despite plaintiff's inconsistent use of the CPAP machine, her sleep apnea did not

22   result in any functional limitations.  Specifically, no doctor – except Dr. Davis – opined that

23   plaintiff required daily naps.  As to Dr. Davis, for the reasons discussed above the court finds that

24   the ALJ properly discredited his opinions.

25   / / /

26   / / /

36

1

### V.  CONCLUSION

2          Based on the foregoing, the court concludes that the Commissioner's final

3   decision is based on substantial evidence and proper legal analysis.  While the court agrees with

4   plaintiff that the ALJ incorrectly concluded that she can perform her past relevant work, the court

5   nonetheless finds that the ALJ correctly applied the Grids as an alternate basis for concluding

6   that plaintiff is not disabled.  Accordingly, IT IS HEREBY ORDERED that:

7          1.      Plaintiff's motion for summary judgment (Doc. 20) is denied;

8          2.      Defendant's cross-motion for summary judgment (Doc. 23) is granted; and

9          3.      The Clerk of the Court is directed to enter judgment and close this file.

10

11   DATED:  July 9, 2009

12

13                                              **CRAIG M. KELLISON**
                                                UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26